## CAMPBELL *v.* WADSWORTH ET AL.

ERROR TO THE SUPREME COURT OF THE STATE OF OKLAHOMA.

No. 72. Argued November 21, 1918.—Decided December 16, 1918.

The Seminole Agreement of October 7, 1899, 31 Stat. 250, provides for enrollment by the Commission to the Five Civilized Tribes of "all children born to Seminole citizens," up to and including December 31, 1899, and of all Seminole citizens then living, and that the rolls so made, when approved by the Secretary of the Interior, shall constitute the final rolls of Seminole citizens, upon which allotment and distribution of lands, etc., of the Seminole Indians shall be made, "and to no other persons." The next paragraph prescribes that, if any member of the tribe die after December 31, 1899, the lands, etc., to which he would be entitled if living, "shall descend to his heirs who are Seminole citizens." A father, enrolled only as a Seminole, the roll referring to his wife and family as Creeks, died after that date, leaving a wife and daughters, who were enrolled only as Creeks, their roll describing him as an enrolled Seminole. Both rolls were final; and they, with other evidence, are here regarded as establishing a Creek custom assigning children of mixed marriages the tribal status of their mother. *Held,* that the father's share of Seminole lands, subsequently allotted, did not descend to the mother or the daughters.

53 Oklahoma, 728, reversed.

THE case is stated in the opinion.

*Mr. C. Dale Wolfe,* for plaintiff in error, submitted.

*Mr. Samuel Herrick,* with whom *Mr. John S. Severson* was on the brief, for defendants in error.

MR. JUSTICE CLARKE delivered the opinion of the court.

The defendants in error brought suit to quiet title to the lands in controversy in this case, the facts involved being agreed upon as follows:

Louis Cox, whose name appears in the final rolls of the Seminole Tribe of Indians, died intestate, on July 4, 1901, and left surviving him the defendants in error, Annie Cox, his widow, now Annie Wadsworth, and two daughters, Maggie Cox, now Maggie Beamore, and Nancy Cox, now Nancy Alexander. These three women were all duly enrolled on the Creek tribal roll in 1890, and in July, 1901, after the death of Cox, upon an application made in May, 1901, they were enrolled as citizens of the Creek Nation by the Commission to the Five Civilized Tribes, but neither of the three appears on the Seminole rolls. Certified copies of the "final" Seminole roll bearing the name of Louis Cox and of the Creek roll bearing the names of his wife and daughters are in the record. On the former is the notation "Wife and family Creeks" and in the latter Louis Cox is described as an enrolled Seminole.

No allotment of land had been made to Cox at the time of his death, but subsequently the land in controversy was allotted by the United States as his distributive share of the Seminole tribal lands.

The plaintiff in error claims title through one Lucy Wildcat, the only surviving relative of Cox whose name appears on the approved Seminole roll. The widow and daughters claim as heirs of Louis Cox.

The decision of the case depends upon the application to the facts thus stated of the second paragraph of the

the words "Seminole citizens" in the second paragraph of the act should have a more elastic meaning than was in terms given to them in the first paragraph and, by interpreting them so as to include the wife and daughters of the deceased, it found the title to the lands to be in the latter subject to the dower estate of the former. [53 Oklahoma, 728].

This judgment, being within the provisions of § 7 of the Act approved September 6, 1916, amending § 237 of the Judicial Code (39 Stat. 726), is properly before us for review on writ of error.

The first paragraph of the agreement, which we have quoted, prescribes the persons whose names shall go upon the Seminole roll and it declares that the rolls so made, when approved by the Secretary of the Interior, "shall constitute the final rolls" of "Seminole citizens" and that to these "and to no other persons" shall allotment of property be made. This definition of "Seminole citizens" is followed in the second paragraph with the provision that the property of an intestate, such as we have in this case, shall descend to his heirs who are "Seminole citizens."

There is nothing in the act to indicate an intention on the part of Congress or of the tribe that the words, "Seminole citizens," as used in the second, shall have any other meaning than that specifically given to them in the first paragraph, but, on the contrary, both the natural and the legal inference from their being used in such juxtaposition is that the same meaning shall be given them and that if a different or more comprehensive meaning had been intended it would have been expressed.

But there are other cogent reasons why courts should not modify these final rolls by liberal interpretation of this statutory provision.

The rolls of the Seminole Tribe were compiled by the Commission to the Five Civilized Tribes, a quasi-judicial tribunal, to which large powers were given by statute for

that specific purpose, and the action of the Commission, when approved by the Secretary of the Interior, made "final" by the statute, so conclusively settles all questions within its jurisdiction as to membership in the tribe, and as to the rights of the Indians to tribal property, that they are subject to attack, as the judgments of courts are, only for fraud and mistake—of which there is no suggestion in this record. *United States* v. *Wildcat*, 244 U. S. 111.

The principal reason given by the Oklahoma Supreme Court for its second conclusion is that, the daughters of Cox being children born to a Seminole citizen prior to the 31st day of December, 1899, were entitled to enrollment as Seminole Indians under the first paragraph of the agreement and if so enrolled would be strictly within the terms of the act and would inherit the land.

We think it very clear that this reason is not sound.

The Seminole Tribe was derived from the Creek, and the tribal customs and traditions of the two had much in common. While this record does not show specifically what the tribal custom of the Seminoles was with respect to tribal recognition of children born of mixed marriages, it does show definitely that by the Creek Indians, and it is with enrolled Creek Indians that we are dealing, the children of mixed marriages were treated and enrolled as members of the tribe of their mother, for the names of the daughters of Cox are found on the tribal roll of the Creek Indians of 1890, when they were very young children, and again in 1901, when Maggie was twenty years of age and Nancy was seventeen, apparently on their own application, they and their mother were placed by the Commission on the final roll of the Creek Tribe. This Creek roll also shows that the father of the children, Louis Cox, was a Seminole, and the Seminole roll on which Cox's name appears bears the notation, "Wife and family Creeks." Thus it is plain that it was not through any mistake or

oversight that the children of Cox were omitted by the Commission from the Seminole roll and were placed upon the Creek roll, but that this was done for the sufficient reason that tribal custom and tradition required their enrollment as Creeks, and the law nowhere provided for their enrollment in more than one tribe. The final rolls, alike of the Seminoles and of the Creeks, thus made up by the Commission, were placed by the act of Congress, as we have seen, beyond amendment by the courts on such a record as we have here, and it is impossible for us to conclude that the daughters of Cox were entitled to enrollment as members of the Seminole Tribe, or that having been enrolled as Creeks they may now be given the rights of enrolled "Seminole citizens."

The Supreme Court also says that only "the most powerful and impelling reasons" could induce it to hold that it was the intention of the Indians to exclude their own children from participation in the distribution of their property after death.

While it is true that it seems unnatural for the Indians to have preferred more distant relatives to their own children in providing for the descent and distribution of their property, yet from the terms of the act before us, and also from the provisions of the Supplemental Creek Agreement that "only citizens of the Creek Nation, male and female, and their Creek descendants shall inherit lands of the Creek Nation" (32 Stat. 500), it is clear that with the Indians the interests of the tribe were paramount to those of the family and it was with a knowledge of the mode of life of their primitive people, better and more intimate than the courts can now command, that they determined that this paramount purpose would best be served by giving to children born of mixed marriages the tribal status of their mother.

As we have said, this record does not show affirmatively that the Seminoles had a custom similar to this one of

the Creeks, but such is believed to have been the fact. The Supreme Court of Oklahoma, in its first opinion, said [154 Pac. Rep, 60,61]:

"The defendants have presented the additional proposition here that, according to the custom of the Seminole Nation, the blood of the mother determined the tribe to which the offspring belonged, and the fact that the children, plaintiffs here, were not enrolled as Seminole citizens was not due to any neglect of the parents of the said children or of the Commission to have said children enrolled on the Seminole roll, but the law and the custom of the Seminole Tribe were that the children were of the blood of the mother and members of that tribe to which the mother belonged. While we do not find it necessary to pass upon this proposition, and will leave it, as far as this opinion is concerned, an open question, yet we will say that as far as our investigation has led us, we are of the opinion that this last proposition is a correct statement of the law so far as it applies to the facts as presented in the case at bar."

In *Hughes Land Co.* v. *Bailey*, 30 Oklahoma, 194, the same court in discussing the rights of two daughters born of the marriage of a Creek man to a Seminole woman, said (p. 196): "By virtue of the citizenship of their mother they [the daughters] were enrolled as citizens of the Seminole Nation." And it may be noted that this custom prevails with the Seminole Indians of Florida, from whom those of Oklahoma are derived. (Annual Report, Bureau of American Ethnology, 1883–4, p. 508.) But the most persuasive evidence of this custom is, that the Federal Commissioners with, as we have seen, all of the facts as to parentage before them and considered, enrolled the daughters of Cox in the Creek Tribe of their mother and not in the Seminole Tribe of their father. The Commissioners in making up the rolls which were to be "final" were given authority to consult tribal records and rolls

and "to adopt any other means by them deemed necessary to enable them to make such rolls," (30 Stat. 495, § 21) and in their conclusion, arrived at after many years of experience and painstaking investigation, may well be found a cogent and impelling reason for accepting the terms of the statutory agreement as they are plainly written and for refusing to enlarge them by interpretation.

On its surface this case is typical of those hard cases which proverbially make bad law, but in reality, since the widow and children of Cox, as enrolled Creeks, were entitled each to an allotment in the Creek lands and property (30 Stat. 495, § 21; 31 Stat. 861, §§ 3, 28; and 32 Stat. 500, §§ 7, 8 and 9), their being excluded from an inheritance which they did not attempt to claim for a dozen years after the death of Cox does not present a degree of hardship calling for a strained interpretation of a plain statutory provision limiting inheritances to enrolled Seminole citizens, so that it may include not only persons not so enrolled, but persons who were actually enrolled as Creek citizens.

The conclusion we are announcing is consonant with prior holdings of this court under similar statutes. Thus, in *Washington* v. *Miller*, 235 U. S. 422, under the proviso in the Supplemental Creek Agreement of June 30, 1902, 32 Stat. 500, that "only citizens of the Creek Nation, male and female, . . . shall inherit lands of the Creek Nation," a judgment was affirmed, holding the grantee of a Creek mother entitled, as against the claims of a Seminole father, to lands inherited from the child of their marriage enrolled as a Creek, when, if the father had been an enrolled Creek, he and the mother would have shared the land equally.

And in *McDougal* v. *McKay*, 237 U. S. 372, again under the Supplemental Creek Agreement, it was decided that the Creek father of a child born of his marriage with a non-Creek mother inherited the entire estate of the child,

which died intestate, although his wife would have taken equally with him had she been an enrolled Creek.

All statutes of descent and distribution are arbitrary expressions of the purpose of the law-making power; and that the provisions of such a statute do not happen to meet the notions of justice of a court is not sufficient reason for indulging in an interpretation which modifies their plain and unambiguous terms. Especially is this true of these Indian statutes which are a progressive development, embodying concessions to tribal custom and tradition necessary to be made in order to accomplish a practical, though perhaps not an ideal, dissolution of the tribal relation and distribution of the tribal property.

The rights of this Creek mother cannot rise higher than those of her daughters.

It results that the judgment of the Supreme Court of Oklahoma must be reversed and the case remanded for further proceedings not inconsistent with this opinion.

*Reversed.*